IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


DANA COOK                                                                    PLAINTIFF

vs.                                    Civil No. 4:07-cv-04046

MICHAEL J. ASTRUE                                                    DEFENDANT
Commissioner, Social Security Administration


**MEMORANDUM OPINION**

Dana Cook ("Plaintiff") brings this action pursuant to § 205(g) of Title II of the Social

Security Act ("The Act"), 42 U.S.C. § 405(g) (2006), seeking judicial review of a final decision of

the Commissioner of the Social Security Administration ("SSA") discontinuing her Disability

Insurance Benefits ("DIB") on December 1, 2003 due to a "medical improvement related to her

ability to work."  The parties have consented to the jurisdiction of a magistrate judge to conduct any

and all proceedings in this case, including conducting the trial, ordering the entry of a final judgment,

and conducting all post-judgment proceedings.  (Doc. No. 4).[1]  Pursuant to this authority, the Court

issues this memorandum opinion and orders the entry of a final judgment in this matter.

1. **Background:**

Plaintiff applied for DIB on November 15, 1996, and she was found to be disabled and

eligible for DIB beginning on January 31, 1995.[2]  (Tr. 21, 54-57).  Plaintiff was found to be disabled

---

[1] The docket numbers for this case are referenced by the designation "Doc. No."  The transcript pages for this case are referenced by the designation "Tr."

[2] Plaintiff was awarded DIB in the ALJ's fully-favorable hearing decision dated November 12, 1999.  (Tr. 381-390).  This decision, along with other documents related to Plaintiff's initial disability determination, are included in the transcript.  (Tr. 35-390).  These records will be discussed only when relevant to this review.

1

due to her major depression, menometrorrhagia,[3] pelvic pain, severe dysmenorrhea,[4] and endometriosis.[5]  (Tr. 21, 387).  However, after a subsequent disability review, SSA found Plaintiff had a "medical improvement related to her ability to work" and was no longer disabled.  (Tr. 21, 391-393, 409-411).   SSA ceased providing Plaintiff with disability benefits as of December 1, 2003.[6]  (Tr. 21, 391-393, 409-411).

Plaintiff requested reconsideration of this cessation on January 5, 2004, and a Disability Hearing Officer ("DHO") of the SSA held a disability hearing on May 17, 2004 to review Plaintiff's claims.  (Tr. 395-406, 412, 453-469).  At this hearing, Plaintiff stated she continued to have the same problems she had when she was initially approved for benefits but that she also recently began suffering from fibromyalgia.  (Tr. 418).  She stated at this hearing that she was taking muscle relaxers and pain relievers and was using a TENS unit.  (Tr. 418).  She stated her daily activities included "such things as taking care of her dog, working in the garden for awhile, going to the store, driving to check on her father, and occasionally going fishing."  (Tr. 418).  She stated that she "does her own household chores but is careful not to overdo it."  (Tr. 418).  She stated that she "is able to drive, and does her own grocery shopping."  (Tr. 418).  She stated that "she remains under a lot of stress and sometimes feels 'weak all over.'"  (Tr. 418).

On July 30, 2004, the DHO issued his decision and determined Plaintiff's health had improved and she was able to work.  (Tr. 394, 414-424).  Specifically, the DHO found, at the time

---

[3] "Menometrorrhagia" is defined as "irregular or excessive bleeding during menstruation and between menstrual periods." *PDR Medical Dictionary* 1185 (3d ed. 2006).

[4] "Dysmenorrhea" is defined as "difficult and painful menstruation." *Id.* at 598.

[5] "Endometriosis" is defined as "ectopic occurrence of endometrial tissue, frequently forming cysts containing altered blood." *Id.* at 641.

[6] However, Plaintiff elected to continue receiving disability benefits pending review.  (Tr. 21).

Plaintiff's disability claim was approved in 1999, that Plaintiff complained of migraine headaches and severe pelvic pain. (Tr. 421). However, the DHO found, at the time of the hearing, that Plaintiff did not suffer from headaches, and she did not complain of severe pelvic pain. (Tr. 421). The DHO also found, at the time of the approval, that Plaintiff had recently suffered from significant emotional problems and was taking medication to treat those problems. (Tr. 421). The DHO found, however, that at the time of the hearing, Plaintiff denied having such symptoms, and her recent mental status consultative examination did not establish any such mental diagnosis. (Tr. 421). Accordingly, the DHO found that there had been a medical improvement within the meaning of the law and that Plaintiff was no longer disabled. (Tr. 414-424).

Subsequently, Plaintiff requested a hearing by an ALJ, and this hearing was held on August 24, 2005 in Texarkana, Arkansas. (Tr. 425-426, 648-665). On January 23, 2006, the ALJ entered an unfavorable decision denying Plaintiff's request to reinstate her DIB. (Tr. 19-27). In this opinion, the ALJ found that Plaintiff was disabled within the meaning of the Social Security Act ("the Act") on January 31, 1995, and she had not engaged in substantial gainful activity ("SGA") since that date. (Tr. 26, Finding 1). The ALJ determined Plaintiff was a forty-one year-old individual with an associate's degree in management and had Past Relevant Work ("PRW") as a clerk/cashier, bookkeeper, office manager, and store manager. (Tr. 26, Finding 2). The ALJ found that the medical evidence established that Plaintiff continued to have treatment and a diagnosis for depression and had a history of back and neck pain. (Tr. 26, Finding 3). The ALJ found that Plaintiff's impairments did not meet or equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4 ("Listings"). (Tr. 26, Finding 3).

The ALJ then evaluated Plaintiff's symptoms pursuant to *Polaski v. Heckler,* 739 F.2d 1320

(8th Cir. 1984).  (Tr. 24-25).  First, the ALJ evaluated Plaintiff's daily activities.  (Tr. 24).  The ALJ noted that Plaintiff was, as of the date of the hearing, able to do household chores, laundry, cook, drive, shop, read, and visit her father.  (Tr. 21).  The ALJ found that Plaintiff's ability to do most routine daily activities was inconsistent with her claims of disabling pain.  (Tr. 24).  Second, the ALJ evaluated the duration, frequency, and intensity of Plaintiff's alleged pain.  (Tr. 24).  The ALJ reviewed Plaintiff's medical records and determined that "[w]hile the claimant may experience a degree of discomfort, the severity of her subjective allegations is not borne out by the record."  (Tr. 25).  Third, the ALJ evaluated Plaintiff's claimed precipitating and aggregative factors.  (Tr. 25).  The ALJ noted that Plaintiff claimed her pain was caused by sitting, standing, walking, or making "just about any movement."  (Tr. 25).  The ALJ stated that he considered these claims in reaching his conclusion that Plaintiff retained the RFC to perform light work.  (Tr. 25).

Fourth, the ALJ evaluated the dosage, effectiveness, and side effects of Plaintiff's medication(s).  (Tr. 25).  The ALJ noted that, despite Plaintiff's complaints of allegedly disabling pain, there were significant periods of time that Plaintiff did not take any prescription medication for that pain.  (Tr. 25).  Fifth and finally, the ALJ  evaluated Plaintiff's claimed functional restrictions.  (Tr. 25).  The ALJ noted that Plaintiff claimed, in addition to other things, that she could only stand and walk for thirty minutes and sit for one hour.  (Tr. 25).  The ALJ noted that Plaintiff had a history of back and neck pain but that Plaintiff's diagnosis of impairment was not conclusive as to the ultimate question–whether Plaintiff's medical condition was so severe that it prevented her from doing any productive work.  (Tr. 25).  Based upon this analysis of Plaintiff's subjective complaints, and these *Polaski* factors, the ALJ determined that Plaintiff's testimony and allegations as to the extent of her symptoms, limitations, and restrictions were considered credible

only insofar as they were supported by the medical evidence.  (Tr. 26, Finding 4).

Based upon these findings, the ALJ determined that there had been substantial medical improvement in Plaintiff's impairment related to her ability to perform basic work activities, and Plaintiff retained the Residual Functional Capacity ("RFC") to perform unskilled, light work.  (Tr. 26, Finding 5).  "Light work" involves the following:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 416.967 (2007).  The ALJ also determined that, considering Plaintiff's RFC, age, education, past work experience, and other factors, Plaintiff still retained the ability to perform a significant number of jobs existing in the national economy.[7]  (Tr. 26, Finding 6).  Based upon these findings, the ALJ determined that Plaintiff was no longer disabled within the meaning of the Act as of December 1, 2003.  (Tr. 27, Finding 7).

On March 17, 2006, Plaintiff requested that the Appeals Council review the ALJ's unfavorable decision.  (Tr. 18).  Thereafter, on March 22, 2006 and June 29, 2006, Plaintiff requested that the Appeals Council also consider two additional psychological reports in deciding whether to review the ALJ's decision.  (Tr. 15-16).  One report was a medical report from Dr. Roger D. House dated February 28, 2006, and the other report was a psychological report from Julia M. Wood, Ph.D. dated June 19, 2006 through June 20, 2006.  (Tr. 631-647).  On April 12, 2007, the

---

[7] The ALJ used the Medical-Vocational Guidelines ("Grids") to make this determination, not the testimony of a Vocational Expert ("VE").  However, VE William Elmore appeared, but did not testify, at Plaintiff's administrative hearing.  (Tr. 19-27, 648-665).

5

Appeals Council declined the review the ALJ's decision, despite Plaintiff's newly-submitted evidence.  (Tr. 9-12).  Subsequently, Plaintiff filed the present action.  (Doc. No. 1).  The parties consented to the jurisdiction of this Court on May 8, 2007.  (Doc. No. 4).  This case is now ready for decision.

## 2. <u>Applicable Law:</u>

In reviewing this case, this Court is required to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *See* 42 U.S.C. § 405(g) (2006); *Ramirez v. Barnhart,* 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance of the evidence, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *See Johnson v. Apfel,* 240 F.3d 1145, 1147 (8th Cir. 2001). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome or because the Court would have decided the case differently.  *See Haley v. Massanari,* 258 F.3d 742, 747 (8th Cir. 2001).  If, after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his or her disability by establishing a physical or mental disability that lasted at least one year and that prevents him or her from engaging in any substantial gainful activity.  *See Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines a "physical or mental impairment" as "an impairment that results from anatomical, physiological,

6

or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c).  A plaintiff must show that his or her disability, not simply his or her impairment, has lasted for at least twelve consecutive months.  *See* 42 U.S.C. § 423(d)(1)(A).

To determine whether the adult claimant suffers from a disability, the Commissioner uses the familiar five-step sequential evaluation.  He determines: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the Residual Functional Capacity (RFC) to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  *See Cox,* 160 F.3d at 1206;  20 C.F.R. §§ 404.1520(a)-(f).  The fact finder only considers the plaintiff's age, education, and work experience in light of his or her RFC if the final stage of this analysis is reached.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2003).

### 3. Discussion:

Plaintiff brings the present appeal claiming the following: (1) the ALJ's disability determination is not supported by substantial evidence, (2) the ALJ erred in finding Plaintiff does not meet the requirements for the Listings for mental disorders, and (3) the ALJ erred in failing to properly assess Plaintiff's non-exertional limitations and by applying the Grids.  (Doc. No. 9, Pages 3-19).  In response, Defendant argues that substantial evidence does support the ALJ's disability

determination and his finding that Plaintiff has had a "medical improvement related to her ability to work." (Doc. No. 10, Pages 4-10). Defendant argues that even from the beginning of Plaintiff's treatment, her doctors did not think that her injuries would be permanent. (Doc. No. 9, Page 4). Defendant argues that despite her claimed impairments, Plaintiff was able to attend college classes beginning in 1998. *See id.* Defendant also argues that Plaintiff's medical records indicate her condition improved significantly from 1995 to 2003. *See id.*

### 1. Summary of Medical Evidence

#### A. Records Dated From 1995-1999

Plaintiff was originally found to be disabled and entitled to DIB with an onset date of January 31, 1995. (Tr. 21). On July 17, 1996, over a year after her onset date, Dr. Morris Middleton examined Plaintiff as a part of Plaintiff's continuing psychological treatment. (Tr. 158-161). At that time, Dr. Middleton found Plaintiff suffered from an anxiety disorder and was under stress due to her lack of family support, her financial difficulties, her status as a single parent, her unemployment, and her divorce. (Tr. 160). Dr. Middleton, however, also found Plaintiff was both capable and willing to enter into a vocational training program. (Tr. 160-161). Dr. Middleton recommended Plaintiff for this training, and he recommended Plaintiff be referred to a local mental health clinic for counseling and possible medication. (Tr. 160-161). Dr. Middleton's report indicates Plaintiff's disability was short-term: "Once she has stabilized emotionally, she should be better able to concentrate and be more successful in a training program." (Tr. 160).

On June 9, 1998, Plaintiff was examined at the Holt-Krock Medical Clinic for leukocytosis.[8]

---

[8] "Leukocytosis" is "an abnormally large number of leukocytes, as observed in acute infections, inflammation, hemorrhage, and other conditions." *PDR Medical Dictionary* 1075 (3d ed. 2006). A "leukocyte" is a "type of cell formed in the myelopoietic, lymphoid, and reticular portions of the reticuloendothelial system in various

(Tr. 188).   During this examination, Plaintiff reported she was seeing a psychiatrist for her depression, and she had gone to see a physician for her chronic lower back pain.  *See id.*  Plaintiff also reported during this examination that she was taking college classes and she had to stop taking some of her medication because of these classes.[9]  *See id.*  On December 15, 1998, Dr. Roshan Sharma examined Plaintiff for her complaints of neck and back pain, migraine headaches, and right ankle pain.  (Tr. 345).  Dr. Sharma reported that Plaintiff was alert, oriented, and cooperative.  *See id.*  Dr. Sharma also reported that Plaintiff had a full range of motion in her neck but that she had trigger points with significant tenderness in her upper trapezius muscles and upper back.  *See id.*  Dr. Sharma recommended that Plaintiff return to therapy to try to decrease her neck and lower back pain.  *See id.*  Dr. Sharma also recommended that Plaintiff attend his pain management sessions where she could be taught different strategies and coping skills to help manage her pain.  *See id.*

From December 17, 1998 until August 20, 1999, Plaintiff attended several pain therapy sessions with Dr. Sharma.[10]  (Tr. 348-378).  On February 3, 1999, Dr. Sharma referred Plaintiff for a Magnetic Resonance Imaging ("MRI"), and Plaintiff's cervical and lumbar spine examinations were found to be normal.  (Tr. 357-360).  On February 23, 1999, Dr. Sharma encouraged Plaintiff to begin taking antidepressants, but Plaintiff refused to take antidepressants, claiming she was not depressed.  (Tr. 364).  On March 5, 1999, Plaintiff reported that her pain management sessions were

---

parts of the body, and normally present in those sites and in the circulating blood (rarely in other tissues)."  *Id*. at 1074.

[9] During an examination on December 15, 1998, Plaintiff confirmed that she was taking business administration classes at Texarkana College.  (Tr. 345).

[10] Plaintiff did, however, miss several sessions because her daughter was out of school, and her daughter was unable to accompany her on the bus.  (Tr. 351). Also, on January 27, 1999, Plaintiff reported to Dr. Sharma that she was under significant anxiety and was not able to attend her pain management sessions because of her classes. (Tr. 355).

"extremely helpful" in managing her pain, stress, and anxiety.  (Tr. 368).

From March 5, 1999 until July 9, 1999, Dr. Sharma reported that Plaintiff had consistent problems with anxiety and stress.  (Tr. 368-376).  However, on July 30, 1999, Dr. Sharma reported that he thought, due to the fact that she is a "young person," Plaintiff "could be retrained in the vocational setting" and presumably could return to work in the future.  (Tr. 377).  On August 20, 1999, Dr. Sharma also reported that Plaintiff had been participating in pain management sessions, and he thought that those sessions were "certainly" helping her with the stress and anxiety.  (Tr. 378).

### B. Records Dated From 2000-2005

From May 9, 2000 until September 16, 2005, Plaintiff was treated by Dr. J. Rob Butler, D.C. at the Butler Chiropractic Center.  On May 9, 2000, Dr. Butler began treating Plaintiff for upper back and neck pain; and throughout her five years of treatment at Butler Chiropractic Center, Plaintiff's condition essentially remained unchanged.  (Tr. 511-517, 542-597).  In fact, the records indicate that Plaintiff's condition may have become more severe.  (Tr. 597).  On September 16, 2005, Plaintiff reported that she suffered from both upper and lower back and neck pain, which had essentially remained unchanged since her treatment began.  (Tr. 597).

On April 4, 2003, Plaintiff was examined by another chiropractor, Dr. Louie T. Ballis, D.C. (Tr. 470-475).  Dr. Ballis reported that he determined Plaintiff's "subjective complaints are consistent objective findings" but that he was not qualified to make any report regarding Plaintiff's depression.  *See id.*  As a part of his report, Dr. Ballis included a subjective complaint checklist that had been completed by Plaintiff.  *See id.*  In her responses to this checklist of questions, Plaintiff reported that her pain was "very severe at the moment," it was painful for her to look after herself

and that she was "slow and careful," she could lift only "very light weights," she could "hardly read at all" because of the severe pain in her neck, she had "severe headaches which come frequently," she could not "concentrate at all," she could not do her "usual work," she could hardly drive because of the severe pain in her neck, her sleep was "completely disturbed," and she could not do "recreation[al] activities at all." (Tr. 471-472). In her responses, Plaintiff also reported that she no longer suffered from migraine headaches. (Tr. 472-473). She also reported that she was not taking any prescription pain medication but that she was only taking Advil. (Tr. 472-473).

On September 11, 2003, Plaintiff underwent a consultative examination by a physician at the Family Practice Center (AHEC). (Tr. 476-482). This physician determined that Plaintiff had a history of neck and back pain and suffered from migraine headaches. (Tr. 482). This physician noted that Plaintiff suffered from severe pain but that Plaintiff needed an MRI in order to "quantify/qualify" Plaintiff's symptoms and level of pain. (Tr. 482). On October 2, 2003, presumably in response to this request for an MRI or other testing, Dr. Silva took AP and lateral views of Plaintiff's cervical spine, evaluated Plaintiff's cervical spine, and essentially found no problems. (Tr. 484). Specifically, Dr. Silva found as follows: "Mild accentuation of the lordotic curvature of the lumbar spine but no other obvious abnormalities are seen of the lumbar spine except for some mild dextroscoliosis.[11]" (Tr. 484).

On October 2, 2003, Dr. John Michael Jameson, Ph.D., a psychologist, examined Plaintiff's mental status and prepared a "Mental Status and Evaluation of Adaptive Functioning" report. (Tr. 485-492). During this examination, Dr. Jameson observed no overt indications of pain. (Tr. 491). Although Plaintiff presented herself as disabled, Dr. Jameson reported her behavior was

---

[11] "Scoliosis" is defined as an "abnormal lateral and rotational curvature of the vertebral column." *PDR Medical Dictionary* 1734 (3d ed. 2006).

11

unremarkable and that Plaintiff provided conflicting information at times.  (Tr. 487).  Dr. Jameson reported that Plaintiff had spontaneous, coherent, and well-organized verbal responses and that Plaintiff denied having hallucinations.  (Tr. 497).  Dr. Jameson also reported that there was no indication of obsessive or delusional thinking.  (Tr. 497).  Dr. Jameson reported Plaintiff presented with euthymic[12] mood and affect, as well as normal social interests.  (Tr. 488).

Dr. Jameson reported Plaintiff was well-oriented and presented no evidence of an affective disorder.  (Tr. 488).  He concluded Plaintiff had no mental diagnosis, and her Global Assessment of Functioning ("GAF") was 85.  (Tr. 489).  He reported that Plaintiff admitted she was not taking pain medications and that she could drive, perform household chores, and make change.  (Tr. 491).  He reported that there was "nothing in the claimant's report or behavior to suggest unusual distress or anxiety or impaired adaptive functioning."  (Tr. 492).  He also reported that the "claimant never identified how her physical problems interfered with employment."  (Tr. 492).  He did not diagnose Plaintiff with depression.  (Tr. 485-492).

From January 16, 2004 until September 10, 2005, Plaintiff was treated by Dr. Stratton Douglas.  (Tr. 518-524).  These treatment notes provide little information on Plaintiff's condition, apart from a note dated March 22, 2004 which states that Dr. Douglas considered non-medical treatment to be most appropriate for Plaintiff.  (Tr. 520).  Also, on November 10, 2004, Plaintiff reported to Dr. Douglas that she did not feel depressed.  (Tr. 614).  On August 15, 2005, Dr. Douglas diagnosed Plaintiff with "minimal obstructive airways disease" but reported no other significant findings related to this limitation.  (T. 602).  Dr. Douglas did not report any other significant medical findings, apart from his repeated urging that Plaintiff cease smoking.  (Tr. 613).

---

[12] "Euthymia" is "joyfulness; mental peace and tranquility."  *Id.* at 678.

12

From January 19, 2004 until March 22, 2004, Dr. Jameson treated Plaintiff on three different occasions.  (Tr. 492-493).  On January 19, 2004, Dr. Jameson noted that Plaintiff had been prescribed medication for several different medical problems, including Post-Traumatic Stress Disorder ("PTSD"), anxiety, difficulty sleeping, neck pain, headaches, fibromyalgia, arthritis, tachycardia,[13] and allergies. (Tr. 494).  On March 22, 2004, Dr. Jameson reported that Plaintiff gave a poor response to medication, and he reported that he would emphasize nonmedical intervention, including counseling and a sleep study.  (Tr. 493).

From March 29, 2004 until June 28, 2004, Plaintiff was treated by Dr. George Garrett for an anal cyst.  (Tr. 525-539).  This cyst was examined, determined to be nonmalignant, was treated, and had "completely healed."  (Tr. 525, 531-533).

On June 12, 2004, Dr. Bruce L. Safman diagnosed Plaintiff with mild left carpal tunnel syndrome and an "extremely mild bilateral cubital tunnel syndrome."  (Tr. 576-577).  On October 4, 2004, however, Plaintiff reported that she had not been using her splint for her left carpal tunnel syndrome and declined to have pain injections for her condition.  (Tr. 617).  The medical records indicate that Plaintiff sought no further treatment for this condition.

### C. Records Dated 2006

On February 28, 2006, Dr. Roger House evaluated Plaintiff's claimed mental impairments.  (Tr. 631-642).  Dr. House reported that if Plaintiff "gets around strangers she gets nervous easily. She has had multisymptom panic attacks with agoraphobia."  (Tr. 639).  He reported Plaintiff "has difficulty falling asleep and is unable to stay asleep due to pain."  (Tr. 640).  He reported Plaintiff

---

[13] "Tachycardia" is defined as "rapid beating of the heart, conventionally applied to rates over 90 beats per minute."  *Id.* at 1931.

"is stressed, anxious, and depressed" and "is anxious and sad." *See id.*  He reported Plaintiff suffered from a depressive syndrome characterized by the following: (1) sleep disturbance, (2) psychomotor agitation or retardation, (3) decreased energy, (4) feelings of guilt or worthlessness, and (5) difficulty concentrating or thinking.  (Tr. 633).  He also reported Plaintiff suffered from generalized persistent anxiety accompanied by the following: (1) motor tension, (2) autonomic hyperactivity, (3) apprehensive expectation, and (4)  vigilance and scanning.  (Tr. 634).  He did not elaborate on these specific findings.

He also reported Plaintiff suffered from "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average at least once a week" and from "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress."  (Tr. 634).  He reported that Plaintiff is "depressive and anxious."  (Tr. 637).

From June 19, 2006 until June 20, 2006, Plaintiff was evaluated by Julia M. Wood, Ph.D., a licensed psychologist at the Southwest Arkansas Counseling and Mental Health Center, Inc. (Tr. 643-647).  Ms. Wood reported that Plaintiff's "overall profile suggests a general depression with extreme anxiety and defensiveness." (Tr. 645).  Ms. Wood concluded that "Ms. Cook would greatly benefit from therapy and appropriate medication to treat her psychological disorders" but that "[w]ithout medication and treatment, it is likely that Ms. Cook will continue to deteriorate psychologically." (Tr. 646).  Ms. Wood diagnosed Plaintiff with generalized anxiety disorder (with a history of PTSD) and major depressive disorder (recurrent, severe).  (Tr. 647).

14

**2. ALJ's RFC Determination**[14]

Prior to Step Four of the sequential analysis in a disability determination, the ALJ is required to determine a claimant's RFC. *See* 20 C.F.R. § 404.1520(a)(4)(iv). This RFC determination must be based on medical evidence that addresses the claimant's ability to function in the workplace. *See Stormo v. Barnhart,* 377 F.3d 801, 807 (8th Cir. 2004). The ALJ should also consider "'all the evidence in the record' in determining the RFC, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Stormo v. Barnhart,* 377 F.3d 801, 807 (8th Cir. 2004) (quoting *Krogmeier v. Barnhart,* 294 F.3d 1019 (8th Cir. 2002)). The plaintiff has the burden of producing documents to support his or her claimed RFC. *See Cox*, 160 F.3d at 1206; 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The ALJ, however, bears the primary responsibility for making the RFC determination and for ensuring that there is "some medical evidence" regarding the claimant's "ability to function in the workplace" that supports its RFC determination. *Lauer v. Apfel,* 245 F.3d 700, 703-04 (8th Cir. 2001). Furthermore, this Court is required to affirm the ALJ's RFC determination if that determination is supported by substantial evidence on the record as a whole. *See McKinney v. Apfel,* 228 F.3d 860, 862 (8th Cir. 2000).

Based upon this review of the record, this Court finds that the ALJ's finding– that Plaintiff retains the ability to perform the full range of light work–is supported by substantial evidence. First, the ALJ's credibility determination, wherein the ALJ found Plaintiff's subjective complaints were not entirely credible, is supported by substantial evidence in the record. Second, based upon a thorough review of the transcript, this Court finds that Plaintiff's medical records support the ALJ's

---

[14] Although Plaintiff did not specifically raise the ALJ's RFC determination in her briefing, this issue is necessary to determine whether the ALJ's decision is supported by substantial evidence in the record. Therefore, this Court will address this issue.

15

finding that Plaintiff retains the ability to perform light work.

## A. ALJ's Credibility Determination

In general, in assessing the credibility of a claimant, the ALJ is required to examine and to apply the five factors from *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1984) or from 20 C.F.R. § 404.1529 and 20 C.F.R. § 416.929.[15]  *See Shultz v. Astrue,* 479 F.3d 979, 983 (2007).  The factors to consider are as follows: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the functional restrictions.  *See Polaski,* 739 at 1322.  The factors must be analyzed and considered in light of the claimant's subjective complaints of pain.  *See id.* The ALJ is not required to methodically discuss each factor as long as the ALJ acknowledges and examines these factors prior to discounting the claimant's subjective complaints.  *See Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000).  As long as the ALJ properly applies these five factors and gives several valid reasons for finding that the Plaintiff's subjective complaints are not entirely credible, the ALJ's credibility determination is entitled to deference.  *See id.*; *Cox v. Barnhart,* 471 F.3d 902, 907 (8th Cir. 2006).  The ALJ, however, cannot discount Plaintiff's subjective complaints "solely because the objective medical evidence does not fully support them [the subjective complaints]." *Polaski,* 739 F.2d at 1322.

When discounting a claimant's complaint of pain, the ALJ must make a specific credibility determination, articulating the reasons for discrediting the testimony, addressing any

---

[15] Social Security Regulations 20 C.F.R. § 404.1529 and 20 C.F.R. § 416.929 require the analysis of two additional factors: (1) "treatment, other than medication, you receive or have received for relief of your pain or other symptoms" and (2) "any measures you use or have used to relieve your pain or symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)."  However, under *Polaski* and its progeny, the Eighth Circuit has not yet required the analysis of these additional factors.  *See Shultz v. Astrue,* 479 F.3d 979, 983 (2007).  Thus, this Court will not require the analysis of these additional factors in this case.

inconsistencies, and discussing the *Polaski* factors. *See Baker v. Apfel,* 159 F.3d 1140, 1144 (8th Cir. 1998). The inability to work without some pain or discomfort is not a sufficient reason to find a Plaintiff disabled within the strict definition of the Act. The issue is not the existence of pain, but whether the pain a plaintiff experiences precludes the performance of substantial gainful activity. *See Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991).

In the present action, the ALJ evaluated all five factors from *Polaski*, applied those factors to the facts in Plaintiff's case, and discounted Plaintiff's subjective complaints for legally-sufficient reasons. (Tr. 24-25). *See Polaski,* 739 F.2d at 1322. Plaintiff has not objected to the ALJ's evaluation of her subjective complaints in the present action. Accordingly, the ALJ's credibility determination is entitled to deference and should be affirmed. *See Cox,* 471 F.3d at 907.

### B. Plaintiff's Medical Records

Plaintiff's medical records indicate that she has been receiving treatment for over a decade for a number of different impairments, including depression, neck pain, back pain, and anxiety disorder. (Tr. 152-380, 469-647). *See Summary of Medical Evidence, supra.* It is important to note, however, that, as early as 1998, Dr. Middleton, Plaintiff's examining physician, reported that he did not consider Plaintiff's impairments to be permanent. (Tr. 159-161). Dr. Middleton opined that once Plaintiff had stabilized emotionally, she would be able to better concentrate and could begin a training program. (Tr. 160-161). Indeed, as early as 1998, Plaintiff was able to continue her vocational training in business administration at Texarkana College. (Tr. 345).

Throughout 1999, Dr. Sharma treated Plaintiff for her pain, anxiety, and depression. (Tr. 348-378). Despite Plaintiff's current claims of disability due to depression, on February 23, 1999, Plaintiff reported to Dr. Sharma that she *was not depressed* and that *she did not need to take*

17

*antidepressants.* (Tr. 364). On July 30, 1999, Dr. Sharma indicated that he believed Plaintiff's mental and physical impairments were not permanent and that she could return to work in the future: "Patient participated in the pain management session today. As I spent time with her, I feel she is a young person and she could be retrained in a vocational setting." (Tr. 377). On August 20, 1999, Dr. Sharma reported that his pain management sessions were *certainly* helping Plaintiff with her stress and anxiety. (Tr. 328). As a treating physician, Dr. Sharma's opinion is entitled to great weight if supported by acceptable clinical or diagnostic data. *See* 20 C.F.R. § 404.1527(d)(2); *Reed v. Barnhart,* 399 F.3d 917, 920 (8th Cir. 2005); *Ellis v. Barnhart,* 329 F.3d 988, 995 (8th Cir. 2005).

Additionally, on April 4, 2003, Plaintiff reported that, *despite her complaints of disabling ankle, neck, shoulder, and back pain,* she was not taking any prescription medication but was only taking Advil. (Tr. 473). Plaintiff's failure to take prescription pain medication, and her use of only over-the-counter pain medication for physical pain, weighs against her claims of disabling pain. *See Harris v. Barnhart,* 356 F.3d 926, 930 (8th Cir. 2004); *Davis v. Apfel,* 239 F.3d 962, 966-967 (8th Cir. 2001).

Dr. Jameson's independent consultative report, dated October 2, 2003, also supports the ALJ's determination that Plaintiff was able to perform light work and was no longer disabled due to depression. (Tr. 485-492). Dr. Jameson reported Plaintiff's behavior was unremarkable, she provided conflicting information at times, and she exhibited no overt indications of pain. (Tr. 485-487). Dr. Jameson also *did not diagnose* Plaintiff with depression or find that she suffered from any other significant functional limitations. (Tr. 485-492). In fact, Dr. Jameson found that Plaintiff had a GAF of 85, indicating Plaintiff was a highly functioning individual capable of concentrating in the work place. (Tr. 489). *See Diagnostic Statistical Manual IV-TR* 34 (4th ed. 2004) (stating that

18

a person with a GAF of 81-90 has "absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g. an occasional argument with family members)."). Furthermore, Plaintiff's report to Dr. Jameson was consistent with her report on April 4, 2003 that she was not taking any prescription medication, including prescription *pain medication*. (Tr. 491).

Furthermore, Plaintiff's primary records supporting her claim of a disability due to *physical impairments* are from two chiropractors, Dr. Butler and Dr. Ballis. (Tr. 470-475, 511-517, 542-597). Records or opinions from chiropractors should be considered by this Court, but they cannot be used to establish a disability. *See* 20 C.F.R. § 404.1513 (2007); *Cronkhite v. Sullivan*, 935 F.2d 133, 134 (8th Cir. 1991) (noting that "[t]he ALJ properly gave little weight to the opinions of Cronkhite's chiropractors because such evidence is not considered an 'acceptable source' of medical information to prove disability; it may be used only to show an impairment affects the claimant's ability to work."). Accordingly, although these records were considered  by this Court, Plaintiff cannot use her records from Dr. Butler and Dr. Ballis to establish her disability.

Plaintiff's primary records supporting her claim of a disability due to *mental impairments* are dated from 2006, nearly *three years after* the SSA's determination that Plaintiff's disability benefits should cease. (Tr. 391-393). Neither of these reports were considered by the ALJ in forming his opinion, and the Appeals Council declined to review the ALJ's decision even after receiving and reviewing these reports. (Tr. 9-11. 19-27). Both of these reports support Plaintiff's claim that she suffers from a mental disability. ( Tr. 631-647). However, this Court finds that these reports are dated significantly after the SSA's determination that Plaintiff's disability benefits should cease and

are composed almost entirely of an unbiased acceptance of Plaintiff's subjective complaints.  (Tr. 631-647).  These reports also are from non-treating psychologists, are not entitled to controlling weight, and may be disregarded after considering the record as a whole.  *See* 20 C.F.R. § 404.1527(d).  This Court notes that these reports are inconsistent with the findings from Dr. Jameson and Dr. Sharma, and they should be disregarded because they are also inconsistent with the record as a whole.

### 3. Mental Impairment Listings - 12.04 and 12.06

Plaintiff also claims the ALJ erred in finding that Plaintiff did not meet the Listings under 12.00, *et seq*. for mental disorders.  (Doc. No. 9, Pages 5-18).  Plaintiff does not clearly specify which Listing she claims to meet, but she apparently argues that she meets the requirements of Listing 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders).  *See id.*  In response, Defendant argues that Plaintiff does "not remotely approach any of the symptoms required to meet or equal a listing in the Listing of Impairments."  (Doc. No. 10, Page 9).  Defendant argues that it is Plaintiff's burden to establish that  her impairment meets or equals a Listing and that Plaintiff has wholly failed to meet that burden.  *See id.*

Listing 12.04 for Affective Disorders is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation."  Listing 12.06 for Anxiety-Related Disorders "is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders." These Listings both require a showing of either depression or anxiety that are characterized by a

20

number of different symptoms.

To support her claim that she meets the requirements of these Listings, Plaintiff offers excerpts from the records of Dr. House and Southwest Arkansas Counseling and Mental Health Center. (Doc. No. 10, Pages 5-18). This Court has already considered these reports and has given them very little weight because they are inconsistent with the record as a whole and are dated three years after the SSA determined to discontinue Plaintiff's benefits. Therefore, even assuming Plaintiff can establish she meets the requirements of Listings 12.04 and 12.06 based upon these two reports, this Court has already determined that these reports cannot be used to establish a disability and, thus, also cannot be used to establish that Plaintiff meets the requirements of these two Listings.

### 4. Non-Exertional Limitations/Grids

In her appeal brief, Plaintiff argues the ALJ erred by failing to assess Plaintiff's non-exertional limitations and by using the Grids to support his finding that Plaintiff is not disabled. (Doc. No. 9, Pages 18-19). Plaintiff argues that she suffers from the non-exertional impairments of "personality disorder, general anxiety disorder, adjustment disorder, low intelligence, and lack of manual dexterity," which she claims all significantly impact her ability to work at all exertional levels and which she claims required the testimony of a Vocational Expert ("VE") to support a finding that she was not disabled. *See id.*

In response, Defendant argues that the ALJ properly relied upon the Grids in making his disability determination and was not required to hear testimony of a VE. (Doc. No. 10, Pages 9-10). Defendant argues that the Grids may be used even when a claimant suffers from nonexertional limitations as long as those nonexertional limitations do not diminish that claimant's ability to perform the full range of work. *See id.* Defendant argues that Plaintiff's nonexertional limitations

21

do not diminish his ability to perform the full range of light work and that the ALJ, therefore, properly applied the Grids in Plaintiff's case. *See id.*

As explained above, the ALJ's RFC determination–that Plaintiff retains the ability to perform the full range of light work and that ability is not diminished by nonexertional limitations–is supported by substantial evidence in the record. Accordingly, because the ALJ did not err by finding that Plaintiff's ability to perform the full range of light work was not diminished by her claimed nonexertional limitations, and the ALJ did not err by using the Grids and concluding that Plaintiff was not disabled.

**4. <u>Conclusion:</u>**

Based on the foregoing, the undersigned finds that the decision of the ALJ, denying benefits to Plaintiff, is supported by substantial evidence and should be affirmed. A judgment incorporating these findings will be entered pursuant to Federal Rules of Civil Procedure 52 and 58.

**ENTERED this 29th day of February, 2008.**

/s/   Barry A. Bryant
HON. BARRY A. BRYANT
U.S. MAGISTRATE JUDGE